# EXHIBIT A

dotloop signature verification: dtlp.us/5qlQ-PKI1-VYnr

**EXHIBIT A**

# REAL ESTATE SALE CONTRACT

**THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY. IT IS INTENDED TO BE A LEGALLY BINDING AGREEMENT. READ IT CAREFULLY.**

THIS REAL ESTATE SALE CONTRACT (this "**Agreement**") is made and entered into as of the 18th day of January, 2022 (the **"Effective Date"**), by and between Buckingham Square LLC and Crestview Manor Apartments LLC ("**Seller**") and Moshe Silber and Avrahom Orloff and or assigns as signers for LLC TBD ("**Buyer**") for the purchase of that certain land and improvements thereon (collectively referred to as the "**Properties**"), together with fixtures owned by Seller, tangible personal property located on the land, interest in and to any leases, rents and security deposits affecting the Properties, license and occupancy agreements, all assignable service contracts, located in Rockford, County of Winnebago, State of Illinois, and more particularly described as follows:

4116 Florida Dr Rockford, IL – 12-32-326-007

4208 Florida Dr Rockford, IL – 12-32-326-008

4115 Florida Dr Rockford, IL – 12-32-327-014

4205 Florida Dr Rockford, IL – 12-32-328-001

4209 Florida Dr, Rockford, IL – 12-32-328-002

2305 S Alpine Rd Rockford, IL – 12-32-330-009

2315 E Moreland Ave Rockford, IL – 12-32-330-006

2404 E Moreland Ave Rockford, IL – 12-32-328-003

**TERMS AND CONDITIONS**

Seller agrees to sell the Property, and Buyer agrees to purchase the Property, on the following terms and conditions.

1) **PURCHASE PRICE:** The purchase price for the Properties is to be **Twelve million and seven hundred thousand dollars ($12,700,000.00)** which shall be paid via an irrevocable wire transfer at Closing (defined below) pursuant to the terms stated herein (the "**Purchase Price**").

2) **DEPOSIT:** Upon execution of this Agreement, Buyer shall deposit the sum of **Two Hundred thousand dollars ($200,000.00)** in the form of a check or wire transfer to Chicago Title Insurance Company ("**Escrow Agent**" or "**Closing Agent**").

   This sum is a deposit ("**Deposit**") to be credited against the Purchase Price of the Property at Closing or otherwise used as set forth in this Agreement and shall be held in trust in a separate account by Escrow Agent.

3) **CLOSING:** Closing shall take place at the office of Escrow or Closing Agent, or via mail, or such other location as the parties shall mutually agree. Seller and Buyer agree to prepare and execute such instructions as may be necessary and appropriate to close the transaction. Should the instructions fail to be executed as required, Closing Agent shall and hereby is directed to close escrow pursuant to the terms and conditions of this Agreement (the "**Closing**"). "**Closing Date**" shall mean the specific date on which the parties shall agree, and which Seller shall deposit the deed transferring title is recorded, which shall occur no later than March 21, 2022. At Closing, Seller shall deliver or cause to be delivered to the Buyer: 1) Deed 2) Bill of Sale, 3) Assignment of Leases and Rents, 4) Notice to Tenants, 5) Assignment of Contracts, 6) FIRPTA, 7) all leases (to the extent originals are in Seller's possession, or photocopies if originals are not in Seller's possession), 8) a reaffirmation that Sellers material representations and warranties listed in this Agreement are true and correct in all material respects as of the date of Closing, 9) an updated, certified rent roll, 10) such other documents, instruments and amounts as may be reasonably required to carry out the terms and intent of this Agreement. Buyer shall deliver countersigned versions, as applicable, of the forgoing and such other documents and instruments as may reasonably required to carry ~~our~~ out the terms and intent of this Agreement.

4) **PRORATIONS and CLOSING COSTS:**
   **Credit and Prorations**
   (a)  All income and expenses of the Property shall be apportioned as of 11:59 a.m., on the day prior to Closing, as if Buyer were vested with title to the Property during the entire day upon which Closing occurs. Subject to the provisions of this Section 4.4, such prorated items shall include without limitation the following: (i) all collected Rents, if any; (ii) taxes and assessments (including personal property taxes on the Personal Property) levied against the Property. For avoidance of doubt Seller shall pay/credit to Buyer the unpaid tax for 2021 payable 2022 and a portion of the tax of 2022 payable in 2023 based on the days in 2022 the Property is owned by each party; (iii) utility charges for which Seller is liable, if any, such charges to be apportioned at Closing on the basis of the most recent meter reading occurring prior to Closing (dated not more than fifteen (15) days prior to Closing) or, if unmetered, on the basis of a current bill for each such utility; (iv) all amounts payable under brokerage agreements as follows: Seller will be responsible for leasing commissions if the tenant was given occupancy before the Closing Date. Buyer shall be responsible for leasing commissions if the Tenant was given occupancy on or after the Closing Date; (v) all payments under the Operating Agreements (subject to section (iv)), pursuant to the terms of this Agreement; and (vi) any other operating expenses or other items pertaining to the Property which are customarily prorated between a Buyer and a seller in the county in which the Property is located. In addition, "expenses" of the Property shall include utility costs paid by Seller and reimbursable by tenants ("RUBS") (even if such reimbursement has not incurred),.
   (b)  Notwithstanding anything contained in Section 4.4(a) hereof:

20682565.1

(i) At Closing, (A) Seller shall, credit to the account of Buyer the amount of such Security Deposits (to the extent such Security Deposits have not been applied against delinquent Rents or otherwise as provided in the Leases), and (B) Buyer shall credit to the account of Seller all refundable cash or other deposits posted with utility companies serving the Property to the extent Buyer assumes such contracts with the utility provider and such deposits are actually transferred to Buyer's account, or, at Seller's option, Seller shall be entitled to receive and retain such refundable cash and deposits;

(ii) If the 2021 tax bill has not been issued, the tax credit to Buyer shall be prorated based upon the 2020 tax amounts ~~actually paid~~. Once the 2021 real estate tax bill is available, the parties shall re-prorate the tax amount due, based on the actual 2021 tax bill with Seller paying any deficiency due Buyer over the amount credited at Closing or Buyer paying Seller the difference resulting from any overpayment. The taxes and assessments that accrued with respect to the year of Closing shall be re-prorated on the basis of 105% of the 2021 tax bill. Seller shall credit any deficiency and Buyer shall refund to Seller any overpayment provided at closing based on the 2021 tax bill. The parties shall make all necessary adjustments by appropriate payments between themselves within thirty (30) days after such amounts are determined following Closing, subject to the provisions of Section 4 b) (ii) ~~4(d)~~ hereof;

(iii) Charges referred to in Section 4.4(a) hereof which are payable by any tenant to a third party shall not be apportioned hereunder, and Buyer shall accept title subject to any of such charges unpaid and Buyer shall look solely to the tenant responsible therefor for the payment of the same. If Seller shall have paid any of such charges on behalf of any tenant, and shall not have been reimbursed therefor by the time of Closing, Buyer shall credit to Seller an amount equal to all such charges so paid by Seller;

(iv) As to utility charges referred to in Section 4.4(a)(ffi) hereof, Seller may on notice to Buyer elect to pay one or more or all of said items accrued to the date hereinabove fixed for apportionment directly to the person or entity entitled thereto, and to the extent Seller so elects, such item shall not be apportioned hereunder, and Seller's obligation to pay such item directly in such case shall survive the Closing or any termination of this Agreement;

(vi) Unpaid and delinquent Rent collected by Seller and Buyer after the date of Closing shall be delivered as follows: (a) if Seller collects any unpaid or delinquent Rent for the Property, Seller shall, within fifteen (15) days after the receipt thereof, deliver to Buyer any such Rent which Buyer is entitled to hereunder relating to the date of Closing and any period thereafter, and (b) if Buyer collects any unpaid or delinquent Rent from the Property, Buyer shall, within fifteen (15) days after the receipt thereof, deliver to Seller any such Rent which Seller is entitled to hereunder relating to the period prior to the date of Closing. Seller and Buyer agree that all Rent received by Seller or Buyer after the date of Closing shall be applied first to the current Rent and then to delinquent Rent, if any, in the inverse-order of maturity. Buyer will make a good faith effort after Closing to collect all Rents in the usual course of Buyer's operation of the Property, but Buyer will not be obligated to institute any lawsuit or other collection procedures to collect delinquent Rents. Seller may attempt to collect any delinquent Rents owed Seller and may institute any lawsuit or collection procedures but may not evict any tenant after Closing. In the event that there shall be any Rents or other charges under any Leases which, although relating to a period prior to Closing, do not become due and payable until after Closing or are paid prior to Closing but are subject to adjustment after Closing (such as year-end common area expense reimbursements and the like), then any Rents or charges of such type received by Buyer or its agents or Seller or its agents subsequent to Closing shall, to the extent applicable to a period extending through the Closing, be prorated between Seller and Buyer as of Closing and Seller's portion thereof shall be remitted promptly to Seller by Buyer.

(c) The provisions of this Section 4 shall survive Closing.

**TRANSACTION TAXES AND CLOSING COSTS.**
(a) Seller and Buyer shall execute such returns, questionnaires and other documents as shall be required with regard to all applicable real property transaction taxes imposed by applicable federal, state or local law or ordinance;
(b) Seller shall pay the fees of any counsel representing Seller in connection with this transaction. Seller shall also pay the following costs and expenses:
(i) one-half of the escrow fee, if any, which may be charged by the Escrow Agent or Title Company;
(ii) the fee for the title examination and the Title Commitment and the premium for the extended coverage Owners Title Policy to be issued to Buyer by the Title Company chosen by Seller at Closing in the amount of the Purchase Price, excluding the cost of any other all endorsements thereto; In the event Buyer shall choose a title company other than Seller's title company to conduct the title examination and issue the Title Commitment and the premium for Extended Coverage, Buyer shall be responsible for paying all such title premiums
~~(iii) the fees for recording the Deed;~~
(iv) the fees for the Broker;
(v) any state and county and local transfer tax, which becomes payable by reason of the transfer of the Property from Seller to Buyer.
(c) Buyer shall pay the fees of any counsel representing Buyer in connection with this transaction. Buyer shall also pay the following costs and expenses:
(i) one-half of the escrow fee, if any, which may be charged by the Escrow Agent or Title Company;
(ii) the premium for the Lender's Policy of Title Insurance to be issued to Buyer's lender including all endorsements and the cost of any endorsements to the Owner's Title Policy;
(iii) the cost of any update to the Survey or the cost of a new survey;
(iv) Any mortgage and intangible taxes due with respect to any Buyer financing.
(v) the fees for recording the Deed;
(d) All costs and expenses incident to this transaction and the closing thereof, and not specifically described above, shall be paid by the party incurring same;

The provisions of this Section 4 shall survive the Closing.

5) **TITLE:** Within twenty (20) business days after the Effective Date of this Agreement, Seller shall procure and cause to be delivered to Buyer a preliminary title commitment for an owner's title insurance policy issued by Closing Agent in the amount of the Purchase Price covering title to the Property. Within twenty (20) business days following the receipt thereof, Buyer shall either approve in writing the exceptions contained in said title report or specify in writing any exceptions to which Buyer reasonably objects. If Buyer objects to any exceptions, Seller shall, within five (5) business days after receipt of Buyer's objections, deliver to Buyer written notice that either (i) Seller will, at Seller's expense, attempt to remove the exception(s) to which Buyer has objected before the Closing Date, or (ii) Seller is unwilling or unable to remove any such exception by the Closing Date, in which event Buyer may elect to terminate this Agreement and receive back the entire Deposit, and Buyer and Seller shall have no further obligations under this Agreement; or alternatively, Buyer may elect to purchase the Property subject to such exception(s). Notwithstanding the foregoing,

dotloop signature verification: dtlp.us/5qlQ-PKI1-VYnr

Seller, at its cost, regardless of whether Buyer objects to such matters, shall be obligated to cure or remove by Closing the following: all mortgages, voluntary liens, and judgments, violations, unpaid charges owed to any municipality and other monetary violations which encumber or are filed against the Properties.

Seller shall convey by General Warranty Deed to Buyer (or to such person or entity as Buyer may specify) marketable fee title subject only to the exceptions approved by Buyer in accordance with this Agreement. Title shall be insured by a standard owner's policy of title insurance issued by the Title Company in the amount of the Purchase Price with premium paid by Seller, unless Buyer choses its own title company in which case said premium shall be paid by Buyer.

6) **FINANCING CONTINGENCIES:** Purchaser shall have 30 days form the effective date to finance the purchase of the property. If Buyer does not secure financing within thirty (30) days from the effective date, buyer may terminate the Contract.

7) **PERSONAL PROPERTY:** Title to any personal property to be conveyed to Buyer in connection with the sale of the Property shall be conveyed to Buyer by Bill of Sale at the Closing Date free and clear of all encumbrances (except those approved by Buyer as provided above). The price of these items shall be included in the Purchase Price for the Property, and Buyer agrees to accept all such personal property in "as is" condition.

8) **CONDITION OF PROPERTY:** It is understood and agreed that the Property is being sold "as is"; that Buyer has, or will have prior to the Closing Date, inspected the Property; and that neither Seller nor Agent, except as otherwise provided for herein, makes any representation or warranty as to the physical condition or value of the Property or its suitability for Buyer's intended use.

9) **INSPECTION CONTINGENCIES -** Seller agrees to provide Buyer with items listed below:

   i. All rental agreements, leases, service contracts, insurance policies, latest tax bill(s) and other written agreements or notices which affect the Property.

   ii. The operating statements for the Property for the twelve (12) calendar months immediately preceding the Effective Date.

   iii. A complete and current rent roll, including a schedule of all tenant deposits and fees.

   iv. A written inventory of all items of personal property to be conveyed to Buyer at Closing.

   v. Seller shall deliver copies of the environmental reports performed on the Properties within the last five (5) years, if any.

   vi. The following items, if readily available to Seller: Existing Survey

   Buyer shall acknowledge receipt of these items in writing. Buyer shall have **Fifteen (15)** business days beginning February 3, 2022 to review each of these items. If Buyer fails to approve of these deliverables within the specified time, this Agreement shall be null and void, Buyer's entire Deposit shall be returned, and Buyer and Seller shall have no further obligations hereunder.

   

   b) Buyer shall have **Fifteen (15)** business days beginning February 3, 2022 to inspect the physical condition of the Property, including, but not limited to soil conditions and the presence or absence of lead-based paint and other hazardous materials on or about the Property, and to notify Seller in writing that Buyer approves same. If Buyer fails to approve the physical condition of the Property within the specified time, this Agreement shall be null and void, Buyer's entire Deposit shall be returned, and Buyer and Seller shall have no further obligations hereunder. In the event Seller fails to Deliver the items in this Section 9 prior to February 3, 2022, Purchaser shall have a day to day extension of the Inspection Contingency for each day such items are failed to be delivered to Purchaser. It is also clearly understood that Buyer may disapprove of the Contract for any or no reason, either based on the documentary inspections or on the condition of the Properties.

   

   c) The service contracts to be provided pursuant to Section 9(i) are all of the agreements concerning the operation and maintenance of the Property affecting the Property. The agreement with Seller's property manager, shall be terminated by Seller at closing, unless Buyer desires to assume same. There are no employees of Seller employed in connection with the Properties whom Buyer would be obligated to retain or compensate after the Closing Date. There are no commercial leases, laundry leases or cable contracts located on any one of the Properties. The rent roll for the Properties that shall be delivered pursuant to Section 9(iii) shall be true and correct in all respects as of the date that it will be submitted to Buyer and the rent roll to be delivered at Closing shall be materially true and correct in all material respects as of its date. There are no union contracts or collective bargaining agreements affecting the Property.

   d)

10) **SURVEY:** Seller shall provide to Purchaser a copy of any existing survey if any in sellers possession. Buyer shall be responsible for obtaining a new survey if required by Purchaser or Purchaser's Lender.

11) **RISK OF LOSS:** Risk of loss to the Property shall be borne by Seller until title has been conveyed to Buyer. In the event that the improvements on the Property are destroyed or materially damaged between the Effective Date and the date title is conveyed to Buyer, Buyer shall have the option of demanding and receiving back the entire Deposit and being released from all obligations hereunder, or alternatively, taking such improvements as Seller can deliver along with an assignment of any insurance proceeds. Upon Buyer's physical inspection and approval of the Property, Seller shall maintain the Property through Closing, in the same condition and repair as approved, reasonable wear and tear excepted.

12) **POSSESSION:** Possession of the Property shall be delivered to Buyer on the Closing Date.

20682565.1

13) **LIQUIDATED DAMAGES/NON-REFUNDABLE DEPOSIT:**
    **Default by Buyer.** In the event the sale of the Property as contemplated hereunder is not consummated due to Buyer's default hereunder, Seller shall be entitled, as its sole remedy, to terminate this Agreement and receive the Deposit as liquidated damages for the breach of this Agreement, it being agreed between the parties hereto that the actual damages to Seller in the event of such breach are impractical to ascertain and the amount of the Deposit is a reasonable estimate thereof. Buyer can cure a default within ten (10) days after receipt of notice of default from the Seller, provided the Seller is not required to give Buyer notice of default (and Buyer does not have the right to cure the default) for the failure of Buyer to make any payment under this Agreement, including, but not limited to, the failure to pay the Purchase Price when due, and the failure to Close on the Closing Date.
    **Default by Seller**. In the event the sale of the Property as contemplated hereunder is not consummated due to Seller's default hereunder, Buyer shall be entitled, as its sole remedy, either (a) to receive the return of the Deposit and reimbursement of Buyers documented out of pocket expenses, not to exceed $100,000 in total, which return and payment shall operate to terminate this Agreement and release Seller from any and all liability hereunder, or (b) to enforce specific performance of Seller's obligation to convey the Property to Buyer in accordance with the terms of this Agreement, it being understood and agreed that the remedy of specific performance shall not be available to enforce any other obligation of Seller hereunder. Buyer expressly waives its rights to seek damages in the event of Seller's default hereunder. If the sale of the Property is not consummated due to Seller's default hereunder, Buyer shall be deemed to have elected to terminate this Agreement and receive back the Deposit. In the event of an Intentional Seller Failure To Close (as hereafter defined), Seller will (subject to the following cap) pay Buyer its documented out of pocket expenses, including without limitation, title search, engineering, environmental assessment, fees paid in respect of arranging for financing, survey costs and attorneys' fees incurred by Buyer in connection with Buyer's due diligence investigations, the negotiation and preparation of this Agreement and the enforcement of this Agreement, not to exceed $100,000 in total. Buyer hereby agrees that prior to its exercise of any rights or remedies as a result of any defaults by Seller, Buyer shall first deliver written notice of the default to Seller, and if Seller so elects, Seller shall have the opportunity, but not the obligation, to cure such default within ten (10) days after Seller's receipt of such notice, "Intentional Seller Failure To Close" means a willful intentional and deliberate wrongful failure of Seller to close that is intended to result in, and does result in, Buyer's inability to close the transaction contemplated in this Agreement, for a reason other than Buyer's default or the failure of any condition to Closing to be satisfied.
    **Recoverable Damages.** Notwithstanding the foregoing, in no event shall the provisions of Section 13 limit the damages recoverable by either party against the other party due to the other party's obligation to indemnify such party in accordance with this Agreement. This Section shall survive the Closing or the earlier termination of this Agreement.

14) **SELLER EXCHANGE:** Seller shall have the right (provided Seller has notified Buyer in writing at least ten (10) days prior to the Closing Date) to designate a parcel or parcels of other real estate property (the "**Seller Exchange Property**") which Seller would like to acquire in exchange for the Property. Buyer shall cooperate with Seller in effecting such an exchange provided that: (a) the acquisition and exchange of the designated Seller Exchange Property shall not impose upon buyer an additional financial obligations; (b) Buyer shall have no obligation to close on the Seller Exchange Property beyond a date 180 days from the Closing Date; and (c) Seller shall indemnify and hold buyer harmless from any and all liabilities, claims, losses or actions which Buyer incurs or to which buyer may be exposed as a result of Buyer's participation in the contemplated exchange. However, this Agreement is not subject to or contingent upon Seller's ability to locate Seller Exchange Property of effectuate an exchange. In the event any exchange contemplated by Seller should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

15) **BUYER EXCHANGE:** Buyer shall have the right (provided Buyer has notified Seller in writing at least ten (10) days prior to the Closing Date) to designate a parcel or parcels of other real property (the "**Buyer Exchange Property**") which buyer wishes to exchange for the Property. Seller shall cooperate with Buyer in effecting such an exchange provided that: (a) Seller shall not incur any additional liability or financial obligations as a consequence of Buyer's exchange; (b) Buyer's exchange shall in no way reduce the net amount to which Seller is entitled under the terms of this Agreement; (c) Seller shall have no obligation to close on the Buyer Exchange Property beyond a date 180 days from the Closing Date; and (d) Buyer shall indemnify and hold Seller harmless from any and all liabilities, claims, losses or actions which Seller incurs or to which Seller may be exposed as a result of Seller's participation in the contemplated exchange. This Agreement is not subject to or contingent upon buyer's ability to effectuate an exchange. In the event any exchange contemplated by Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided therein.

16) **AUTHORIZATION:** Buyer and Seller authorize Agent to disseminate sales information regarding this transaction, including the Purchase Price of the Property.

17) **AGENCY DISCLOSURE: Listing Leaders Northwest Inc (Tariq Suboh – IL License# 475.192080)**

    a) **EXCLUSIVE LISTING: --**

    b) **LIMITED AGENCY: Yes**

18) **BROKERS:** With respect to the transaction contemplated by this Agreement, Seller and Buyer represent that the sole broker with respect to this transaction is Tariq Suboh (Broker" or "**Agent**"). Seller will pay any commission due Broker at Closing, pursuant to separate agreement and indemnify Buyer for any claims from Broker. Each party hereto agrees that, if any person or entity, other than Broker makes a claim for brokerage commissions or finder's fees related to the sale of the Property by Seller to Buyer, and such claim is made by, through or on account of any acts or alleged acts of said party or its representatives, said party will protect, indemnify, defend and hold the other party free and harmless from and against any and all loss, liability, cost, damage and expense (including reasonable attorneys' fees) in connection therewith. The provisions of this paragraph shall survive Closing or any termination of this Agreement.

19) **DISCLOSURE OF REAL ESTATE LICENSE: (Tariq Suboh – IL License# 475.192080)**

.

20) **COMPLIANCE WITH LAWS:** Seller and Buyer acknowledge and agree to comply with Illinois and local law concerning the disclosure of environmental information. Buyer and Seller agree to make all disclosures and comply with applicable provisions of local or state law, and any local ordinances with respect to transfer taxes.

21) **LIMITATION OF LIABILITY:** Except for Agent's gross negligence or willful misconduct, Agent's liability for any breach or negligence in its performance of this Agreement shall be limited to the greater of $50,000 or the amount of compensation actually received by Agent in any transaction hereunder.

22) **SCOPE OF AGENT'S AUTHORITY AND RESPONSIBILITY:** Agent shall have no authority to bind either Buyer or Seller to any modification or amendment of this Agreement. Agent shall not be responsible for performing any due diligence or other investigation of the Property on behalf of either Buyer or Seller, or for providing either party with professional advice with respect to any legal, tax, engineering, construction or hazardous materials issues. Except for maintaining the confidentiality of any information regarding Buyer or Seller's financial condition and any future negotiations regarding the terms of this Purchase Agreement or as otherwise required by law, Buyer and Seller agree that their relationship with Agent is at arm's length and is neither confidential nor fiduciary in nature.

23) **BROKER DISCLAIMER:** Buyer and Seller acknowledge that, except as otherwise stated herein, Agent has not made any investigation, determination, warranty or representation with respect to any of the following: a) the legality of the present or any possible future use of the Property under any federal, state or local law; b) pending or possible future action by any governmental entity or agency which may affect the Property; c) the physical condition of the Property, including but not limited to soil conditions, the structural integrity of the improvements, and the presence or absence of fungi or wood destroying organisms; d) the accuracy or completeness of income and expense information and projections, of square footage figures, and of the texts of leases, options and other agreements affecting the Property; e) the possibility that leases, options, or other documents exist which affect or encumber the Property and which have not been provided or disclosed by Seller; f) the presence or location of any hazardous materials on or about the Property, including but not limited to, asbestos, PCBs, other toxic, hazardous or contaminated substances, and underground storage tanks; or g) the accuracy of any information contained in a tenant's or lessee's estoppel certificate. Buyer agrees that investigation and analysis of the foregoing matters is Buyer's sole responsibility and that Buyer shall not hold Agent responsible therefor.

24) **ARBITRATION OF DISPUTES: If a controversy arises with respect to the subject matter of this Agreement or the transaction contemplated herein (including but not limited to the parties' rights to the Deposit or the payment of commissions as provided herein), Buyer, Seller and Agent agree that such controversy shall be settled by non-binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.**

25) **SUCCESSORS & ASSIGNS:** This Agreement and any addenda hereto shall be binding upon and inure to the benefit of the heirs, successors, agents, representatives and assigns of the parties hereto.

26) **ATTORNEYS' FEES:** In any litigation, arbitration or other legal proceeding which may arise between any of the parties hereto, including Agent, the prevailing party shall be entitled to recover its costs, including costs of arbitration, and reasonable attorneys' fees in addition to any other relief to which such party may be entitled.

27) **TIME:** Time is of the essence of this Agreement.

28) **NOTICES:** Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, (b) reputable overnight delivery service with proof of delivery, (c) United States Mail, postage prepaid, registered or certified mail, return receipt requested, or (d) e-mail transmission, sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given upon receipt or refusal to accept delivery, or, in the case of e-mail transmission, as of the date of the e-mail transmission provided that an original of such e-mail is also sent to the intended addressee by means described in clauses (a), (b) or (c) above. Unless changed in accordance with the preceding sentence, the addresses for notices given pursuant to this Agreement shall be as follows:

If to Seller:

Buckingham Square LLC
2689 Briarwood Lane
Glenview< IL 60025
Email: uk1220@aol.com

with a copy to: [TBD]
Nancy Nowak Sander
Sander Law Offices
8532 School street
Morton Grove, IL 60052
Email: nancy@sanderlegal.com

If to Buyer:
129 Thicket Court
Toms River, NJ

With a copy to:
Bar Law Group LLP
311 Blvd of the Americas, Suite 101
Lakewood, NJ 08701
Attn.: Jeffrey Rabinovich, Esq.

Page 5 of 8

20682565.1

29) **FOREIGN INVESTOR DISCLOSURE:** Seller and Buyer agree to execute and deliver any instrument, affidavit or statement, and to perform any act reasonably necessary to carry out the provisions of the Foreign Investment in Real Property Tax Act and regulations promulgated thereunder. Seller represents that Seller is not a foreign person as defined in Section 1445 of the Internal Revenue Code and withholding of any portion of the Purchase Price is not required.

30) **ADDENDA:** Any addendum attached hereto and either signed or initialed by the parties shall be deemed a part hereof. This Agreement, including addenda, if any, expresses the entire agreement of the parties and supersedes any and all previous agreements between the parties with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge its terms, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein. Any future modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

31) **ACCEPTANCE AND EFFECTIVE DATE:** Buyer's signature hereon constitutes an offer to Seller to purchase the Property on the terms and conditions set forth herein. Unless acceptance hereof is made by Seller's execution of this Agreement and delivery of a fully executed copy to Buyer, either in person or by mail at the address shown below, on or before **January** , this offer shall be null and void, the Deposit shall be returned to Buyer, and neither Seller nor Buyer shall have any further rights or obligations hereunder. Delivery shall be effective upon personal delivery to Buyer or Buyer's agent or, if by mail, on the next business day following the date of postmark. The "**Effective Date**" of this Agreement shall be the later of (a) the date on which Seller executes this Agreement, or (b) the date of written acceptance (by either Buyer or Seller) of the final counter-offer submitted by the other party.

32) **GOVERNING LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

33) **NON-DISCRIMINATION:** Buyer and Seller acknowledge that it is illegal for either Seller, Buyer or Agent to refuse to lease or sell to any person on the basis of race, color, religion, national origin, sex, marital status or physical disability.

34) **OTHER TERMS AND CONDITIONS:** Upon completion of Buyer's due diligence pursuant to Section 9 of this Agreement, $50,000 of earnest money shall be deemed hard and non-refundable to Buyer, except in the event of a default by Seller under this Agreement. Furthermore, Buyer is granted the ability to dictate new move in rent prices, up to $850 for a two bedroom and up to $750 for a one bedroom apartments at Buckingham Square and Crestview Manor. Also, all lease renewals for March 1st 2022 and onwards shall be discussed with Buyer's prior to sending them out to existing tenants. Seller shall not apply any security deposits without the Buyer's prior written consent, except if the tenant whose security deposit is being applied has vacated the Property.

35) **Attorneys Fees.** The event of any litigation arising out of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs. The provisions of this Section 9.18 shall survive the Closing and any termination of this Agreement.

36) **Escrow Agent**. Escrow Agent shall hold and dispose of the Deposit in accordance with the terms of this Agreement. Seller and Buyer agree that the duties of the Escrow Agent hereunder are purely ministerial in nature and shall be expressly limited to the safekeeping and disposition of the Deposit in accordance with this Agreement. Escrow Agent shall incur no liability in connection with the safekeeping or disposition of the Deposit for any reason other than Escrow Agent's willful misconduct or gross negligence. In the event that Escrow Agent shall be in doubt as to its duties or obligations with regard to the Deposit, or in the event that Escrow Agent receives conflicting instructions from Buyer and Seller with respect to the Deposit, Escrow Agent shall not disburse the Deposit and shall, at its option, continue to hold the Deposit until both Buyer and Seller agree as to its disposition or until a final judgment is entered by a court of competent jurisdiction directing its disposition, or Escrow Agent shall interplead the Deposit in accordance with the laws of the state in which the Property is located. Escrow Agent shall not be responsible for any interest on the Deposit except as is actually earned, or for the loss of any interest resulting from the withdrawal of the Deposit prior to the date interest is posted thereon or for any loss caused by the failure, suspension, bankruptcy or dissolution of the institution in which the Deposit is deposited.

37) **Seller's Representations, Warranties and Covenants.**
**Organization and Authority**. Seller is authorized to do business in the State of Illinois. Seller has the full right and authority to enter into this Agreement and to transfer all of the Property and to consummate or cause to be consummated the transaction contemplated by this Agreement. The person signing this Agreement on behalf of Seller is authorized to do so.
**Pending Actions**. To Seller's knowledge, Seller has not received written notice of any action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Seller which, if adversely determined, could individually or in the aggregate materially interfere with the consummation of the transaction contemplated by this Agreement or could have a material effect on the Property post-closing and to Seller's knowledge none have been threatened.

**Condemnation.** To Seller's knowledge, Seller has received no written notice of any condemnation proceedings relating to the Property and, to the best of the Seller's knowledge, no condemnation or eminent domain proceedings or negotiations with Seller have been commenced or threatened in connection with the Property or any portion of it.
**Litigation.** To Seller's knowledge, except as set forth on Exhibit K attached hereto, and except tenant eviction proceedings, tenant bankruptcies, proceedings for the collection of delinquent rentals from tenants and proceedings related to claims for personal injury or damage to property due to events occurring at the Property, Seller has not received written notice of any litigation which has been filed against Seller that arises out of the ownership of the Property and would materially affect the Property or use thereof, or Seller's ability to perform hereunder and to Seller's knowledge none have been threatened.
**Notices from Governmental Authorities.** Seller has not received from any governmental authority or agency written notice of any violation of any laws applicable to the Property, or any part thereof, that has not been corrected.

dotloop signature verification: dtlp.us/5qlQ-PKI1-VYnr

Seller shall refrain from entering into or amending any document related to the operation of the Property, which is not terminable upon thirty (30) days written notice without penalty, without the prior written consent of Buyer, which consent will not be unreasonably withheld.

Seller shall refrain from entering into any new service contract, or amending any Operating Agreement, unless the new service contract or amended Operating Agreement may be canceled by the owner of the Property without penalty or cancellation fee upon 30 days' notice without penalty;

Seller shall not sell (or agree to sell) or otherwise dispose (except to dispose of worn out or obsolete Personal Property, provided it is replaced with similar Personal Property) of any item or groups of items constituting the Personal Property.

Seller will not grant any easements or encumbrances in the nature of a deed of trust, mortgage or easement between the date hereof and (i) the Closing Date or (ii) the earlier termination of this Agreement pursuant to its terms.

Prior to Closing, Seller shall not cancel, modify or lower the limits of any existing insurance coverage on the Property and Seller will keep in force and effect with respect to the Property the insurance policies and coverages currently carried by Seller on the date of this Agreement, insuring against loss or damage (including rent loss) by fire and other casualty.

Prior to the Closing, upon the written request of the Buyer, Seller will provide a detailed aged receivable report, a detailed listing of prepaid rents and a detailed list of any pending evictions and litigation.

There are no Seller tax appeals pending with respect to the Property and Seller shall not initiate any tax appeals during the pendency of this Agreement.

**The representations and warranties of Seller set forth in Section hereof as updated as of the Closing in accordance with the terms of this Agreement, shall survive Closing for a period of one hundred eighty (180) days**

38) **Bulk Sales.** The transactions contemplated in this Agreement do not fall under Illinois's bulk sales requirements. Seller is aware Buyer is relying on this representation to close and Seller further agrees to indemnify, defend and hold harmless the Buyer from and against and in respect of any and all losses incurred in connection with same, including without limitation any claims made by creditors, with respect to non-compliance with any bulk transfer law

39) **Attorney Review.** Both buyer and seller shall have a five (5business day attorney review period from the Effective Date, which will allow ~~minor~~ modifications to this contract, ~~not to include pricing, closing date, and timelines.~~ If after ten (10) business days from the Effective Date written agreement has not been reached with regard to resolution of all proposed modifications, etther party may terminate this Agreement by serving Notice wherein this contract shall be deemed terminated.

**(signature page to follow)**

20682565.1

dotloop signature verification: dtlp.us/5qlQ-PKI1-VYnr

**THE PARTIES ARE ADVISED TO CONSULT THEIR RESPECTIVE ATTORNEYS WITH REGARD TO THE LEGAL EFFECT AND VALIDITY OF THIS AGREEMENT.**

**BUYER:** *Avrahom Orloff*
dotloop verified
01/30/22 7:27 PM EST
PESM-ZPSS-Z29V-HPNG

**ADDRESS:** _____

**BUYER:** *Moshe Sibler*
dotloop verified
01/30/22 7:27 PM EST
PCW2-WH77-XZ7K-7XRP

**TELEPHONE:** _____

## SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMISSION TO AGENTS

**SELLER:** *Usha Kamaria*
dotloop verified
01/30/22 6:32 PM CST
YCLJ-FDBU-RKMT-UQ3S

**ADDRESS:** _____

**SELLER:** _____

**TELEPHONE:** _____

**DATE:** _____

**ESCROW AGENT:**

_____

**By:**

Page 8 of 8

20682565.1

**FIRST AMENDMENT TO**
**REAL ESTATE SALE CONTRACT**

FIRST AMENDMENT TO REAL ESTATE SALE CONTRACT made this 16th day of February, 2022, by and between Buckingham Square LLC and Crestview Manor Apartments LLC ("Seller"), and Moshe Silber and Avrahom Orloff and or assigns as signers for LLC TBD (collectively, hereinafter the "Purchaser").

**W I T N E S S E T H:**

WHEREAS, Seller and Purchaser have entered into a Real Estate Sale Contract dated as of January 18, 2022 ("Agreement") with respect to the sale and purchase of 4116 Florida Drive, 4208 Florida Drive, 4115 Florida Drive, 4205 Florida Drive, 4209 Florida Drive, 2305 S Alpine Road, 2315 East Moreland Avenue, 2404 East Moreland Avenue, Rockford, Illinois (the "Premises") (as such term is defined in the Agreement);

WHEREAS, Seller and Purchaser have agreed to amend the terms and conditions of the Agreement as more particularly set forth herein.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) in hand paid, and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. Section 1 is hereby omitted and replaced with the following: "PURCHASE PRICE: The purchase price for the Properties is to be Eleven Million Five Hundred Thousand Dollars ($11,500,000.00), which shall be paid via an irrevocable wire transfer at Closing (defined below) pursuant to the terms stated herein (the "Purchase Price")."

2. The Deposit in the amount of $200,000.00 may be released from the Escrow Agent to Seller immediately and shall be deemed non-refundable unless Purchaser terminates the Agreement and this Amendment pursuant to Section 5 of the Agreement or Sections 5(b) and 9 of this Amendment, in which event the Deposit shall be refunded to Purchaser immediately. Said Deposit shall be credited against Purchase Price at the time of Closing, or if Closing does not occur, retained by the Seller.

3. The first sentence of Section 5 shall be amended to read as follows:

"Within twenty (20) business days from the date of this First Amendment, Seller shall procure and cause to be delivered to Buyer a preliminary title commitment for an owner's title insurance policy issued by Chicago Title Insurance Company in the amount of the Purchase Price covering title to the Property.

4. Section 6 is hereby omitted in its entirety. Purchaser shall have no financing contingency.

5. Section 9 shall be revised as follows:

a) Seller agrees to provide Purchaser with the items listed below:

  i. All rental agreements, leases, service contracts, insurance policies, latest tax bill(s) and other written agreements or notices which affect the Property.
  ii. The operating statements for the Property for the twelve (12) calendar months immediately preceding the Effective Date.
  iii. A complete and current rent roll, including a schedule of all tenant deposits and fees.
  iv. A written inventory of all items of personal property to be conveyed to Buyer at Closing.
  v. Seller shall deliver copies of the environmental reports performed on the Properties within the last five (5) years, if any.

1

vi.     The following items, if readily available to Seller: Existing Survey

b)     (1) For purposes of this Section 9b, (i) the term "Hazardous Substances" shall mean sufficient quantities of those substances which Federal, State or Local law requires to be removed from the Premises or be treated at the Premises and (ii) the term "Clean Up" shall mean all actions required to be taken with regard to any Hazardous Substances found on the Premises by all State, Federal and local governmental bodies and agencies having jurisdiction and obtaining appropriate certificates of compliance from all Federal, State and local agencies and governmental bodies having jurisdiction.

(2) The Purchaser or its lender shall have the right to conduct a Phase I inspection, at Purchaser's sole cost and expense. Such inspection shall be made by an independent, licensed and insured professional (the "Environmental Engineer") within fifteen (15) business days from February 3, 2022.

(3) If the Phase I Report reveals the presence of Hazardous Substances, Purchaser shall forward to Seller a bona fide estimate of the clean-up cost (the "Estimate"), and Purchaser shall have the right to either (i) request a credit to the Purchaser at Closing (by way of reduction of the Purchase Price) for the clean-up cost set forth in the Estimate, and Purchaser shall close subject to all Hazardous Substances, Hazardous Substance contamination, clean up requirements and all information and recommendation(s) set forth in the Phase I Report, without delay and without any other abatement, credit or deduction of any kind or (ii) cancel the Agreement and this Amendment, whereupon Seller's sole liability shall be to refund the Deposit to the Purchaser and, in such event, neither party shall have any further claims, rights or obligations hereunder excepting those expressly stated to survive termination of this Agreement.

c) The service contracts to be provided pursuant to Section 9(i) are all of the agreements concerning the operation and maintenance of the Property affecting the Property. The agreement with Seller's property manager, shall be terminated by Seller at closing, unless Buyer desires to assume same. There are no employees of Seller employed in connection with the Properties whom Buyer would be obligated to retain or compensate after the Closing Date. There are no commercial leases, or cable contracts located on any one of the Properties. The rent roll for the Properties that shall be delivered pursuant to Section 9(iii) shall be true and correct in all respects as of the date that it will be submitted to Buyer and the rent roll to be delivered at Closing shall be materially true and correct in all material respects as of its date. There are no union contracts or collective bargaining agreements affecting the Property.

6.     From the Effective Date through the Closing Date, Purchaser and/or its assigns, representatives, contractors, architects, employees, agents shall have the right to access (i) the leasing office, model unit and basement at Crestview Manor Apartments in order to obtain plans and approvals for renovating same.

7. Seller hereby represents that Unit 3c at 2404 East Moreland Avenue, Rockford, Illinois shall be vacant on or prior to Closing except for the security cameras and equipment which shall remain in said unit.

8. Notwithstanding anything in the Agreement to the contrary, Seller shall not enter into any lease renewal, lease modification or into any new lease without the express written consent of Purchaser. Purchaser shall have the exclusive right to dictate the terms of same.

9. Purchaser shall order a survey for the Premises within 10 days of the date hereof. In the event there is any discrepancy between the survey and the attached maps, which has been has represented to Purchaser as being included in the Premises, Seller shall have the right to challenge such discrepancy by engaging the services of a licensed Illinois surveyor. In the event Seller shall be unable to successful challenge the discrepancies found in Purchaser's survey, Purchaser shall have the right to terminate the Agreement and this Amendment and receive a return of the Deposit.

10. Capitalized terms used herein and not otherwise defined shall have the

meanings ascribed thereto in the Agreement.

11. Except as modified hereby, the Agreement is unmodified and remains in full force and effect.

(signature page to follow)

IN WITNESS WHEREOF, Seller and Purchaser have executed this FIRST AMENDMENT TO REAL ESTATE SALE CONTRACT as of the day and year first above written.

SELLER:

Buckingham Square LLC

By: *(signature)*

Crestview Manor Apartments LLC

By: *(signature)*

PURCHASER:

*(signature)*
Avrahom Orloff

*(signature)*
Mark Silber

4

## SECOND AMENDMENT TO
## REAL ESTATE SALE CONTRACT

SECOND AMENDMENT TO REAL ESTATE SALE CONTRACT made this 28 day of February, 2022, by and between Buckingham Square LLC and Crestview Manor Apartments LLC ("Seller"), and Moshe Silber and Avrahom Orloff and or assigns as signers for LLC TBD (collectively, hereinafter the "Purchaser").

### WITNESSETH:

WHEREAS, Seller and Purchaser have entered into a Real Estate Sale Contract dated as of January 18, 2022, as amended by that First Amendment to Real Estate Contract dated as of February 16, 2022 (jointly, the "Agreement") with respect to the sale and purchase of 4116 Florida Drive, 4208 Florida Drive, 4115 Florida Drive, 4205 Florida Drive, 4209 Florida Drive, 2305 S Alpine Road, 2315 East Moreland Avenue, 2404 East Moreland Avenue, Rockford, Illinois (the "Premises") (as such term is defined in the Agreement);

WHEREAS, Seller and Purchaser have agreed to amend the terms and conditions of the Agreement as more particularly set forth herein.

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) in hand paid, and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. "Closing Date" shall mean the specific date on which the parties shall agree, and which Seller shall deposit the deed transferring title is record, which shall occur no later than March 21, 2022. Buyer shall have the option to extend the Closing Date to no later than April 21, 2022.

2. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Agreement.

3. Except as modified hereby, the Agreement is unmodified and remains in full force and effect.

1

IN WITNESS WHEREOF, Seller and Purchaser have executed this SECOND AMENDMENT TO REAL ESTATE SALE CONTRACT as of the day and year first above written.

SELLER:

Buckingham Square LLC

By: _____

Crestview Manor Apartments LLC

By: _____

PURCHASER:

_____
Avrahom Orloff

_____
Mark Silber

2

## ASSIGNMENT OF CONTRACT

KNOW ALL MEN BY THESE PRESENTS THAT this Agreement is made as of _____ between Avrahom Orloff and Moshe Silber (jointly, "Assignor") and Buckingham and Crestview TIC I LLC, Buckingham and Crestview TIC II LLC, and Buckingham and Crestview TIC III LLC (collectively, "Assignee");

Assignor, party of the first part, in consideration of the sum of Ten ($10.00) Dollars and other valuable considerations paid by Assignee, party of the second part, does hereby assign unto the Assignee all of its rights and obligations in the Real Estate Sale Contract (the "Contract"), dated as of January 18, 2022, as amended, by and between Buckingham Square LLC and Crestview Manor Apartments LLC, as Seller, and Assignor, as Purchaser, with respect to the properties known as 4116 Florida Drive, 4208 Florida Drive, 4115 Florida Drive, 4205 Florida Drive, 4209 Florida Drive, 2305 S Alpine Road, 2315 East Moreland Avenue, 2404 East Moreland Avenue, Rockford, Illinois.

All parties agree to execute any other documents necessary to effectuate the provisions of this agreement.

TO HAVE AND TO HOLD the same unto the said party of the second part its heirs and assigns forever.

IN WITNESS WHEREOF, the said party of the first part has hereunto set his hand and seal as set forth hereinabove.

ASSIGNOR:  
_____  
Avrahom Orloff  

_____  
Moshe Silber

ASSIGNEE:  
Buckingham and Crestview TIC I LLC  
_____  
By:

Buckingham and Crestview TIC II LLC  
_____  
By:

Buckingham and Crestview TIC III LLC  
_____  
By: